IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LINCOLN LAWRENCE HATCH,<br><br>Defendant. | ORDER AND MEMORANDUM DECISION DENYING MOTION FOR COMPASSIONATE RELEASE<br><br>Case No. 2:22-cr-128-TC<br><br>Judge Tena Campbell |

Before the court is Defendant Lincoln Lawrence Hatch's motion for compassionate release, seeking a reduction of his sentence under 18 U.S.C. § 3582(c)(1)(A) to credit for time served followed by supervised release with home confinement. (ECF No. 55). The government opposes Mr. Hatch's motion. (ECF No. 61.) For the reasons set forth below, the court denies the motion.

## BACKGROUND

The court draws its background facts principally from the government's response to the motion (ECF No. 61) and from the Pre-Sentencing Investigative Report (PSR) prepared by Mr. Hatch's probation officer. (PSR, ECF No. 48.) The court also takes under consideration the documents that Mr. Hatch has provided to the court in support of his motion.

In February 2022 Mr. Hatch was pulled over while driving, searched on suspicion of parole violations, and arrested when the police found a stolen firearm in his vehicle. (Id. at 3.)[1] He is currently serving a 63-month prison sentence after pleading guilty to the possession of a stolen handgun. (Id.) His federal sentence runs concurrently with two Utah state prison sentences. Mr. Hatch has been incarcerated since his February 2022 arrest, meaning he has served approximately 37 months or 58% of his 63-month total sentence.[2] He is scheduled for release on January 16, 2027. (ECF No. 61 at 3.)

Since February 2022, Mr. Hatch has had no prison disciplinary issues. He has also successfully completed a GED program along with 11 programs relating to substance abuse, mental health, and parenting. (Def.'s BOP Records, ECF No. 57-1.)

Mr. Hatch, now in his mid-fifties, has a lengthy criminal history beginning when he was eighteen. He has prior state and federal convictions for aggravated assault, possession of drugs (methamphetamines and marijuana) with intent to distribute, possession of a dangerous weapon by a restricted person, theft, burglary, tampering with evidence, criminal trespass, and threatening violence. (PSR at ¶¶ 42, 43, 44, 46–48, 51–56, 59–60, 64–68.) His criminal conduct continued with regularity over the last 30 years leading to his 2022 arrest. (Id. at ¶¶ 35–65.)

Much of Mr. Hatch's criminal conduct took place while he was on supervised release, meaning he has consistently violated various courts' conditions of supervision as well as state and federal law. (Id. at ¶¶ 50–51, 54–60.) At the time of this offense, Mr. Hatch was a Category VI offender. (Id. at ¶¶ 66–68.)

---

[1] When it was seized, Mr. Hatch's stolen firearm was loaded with "hollow point bullets," which expand when fired, resulting in larger, more lethal wounds. (ECF No. 61 at 2.)

[2] The court sentenced Mr. Hatch to 63 months pursuant to the plea agreement, with a downward adjustment of 21 months under 51G1.3 "to account for prior custody time that will not be credited by the BOP due to pending state parole violations." (Judgment, ECF No. 53 at 2.)

While Mr. Hatch has successfully completed several substance abuse treatment programs while in and out of prison, including the Conquest Residential Program from 2002–2003, the HOPE substance abuse program from 2007–2008, the Haven substance abuse program in 2007, and the Valley Camp program in 2010,[3] his use of drugs has persisted. (Id. at ¶¶ 93–95.) As a result, Mr. Hatch was eventually terminated from the drug court program. (Id. at ¶¶ 54–60, 96.)

Before he was sentenced in this case, Mr. Hatch informed the court that he would need intensive outpatient substance abuse treatment when he was released. (Def.'s Sentencing Mem., ECF No. 51.) Mr. Hatch also told the court that he would like to enter and complete the Residential Drug Abuse Program (RDAP) program during his time in the BOP, treatment which the court recommended based on his history of drug abuse. (ECF No. 52). But it does not appear that Mr. Hatch has yet participated in the RDAP program. (Compare id. at 8–9, with Def.'s BOP Records, ECF No. 57-1.)

In September 2024, Mr. Hatch's 87-year-old mother died, leaving his 87-year-old father, Gary Hatch, without a consistent caregiver. Gary Hatch has coronary artery disease with systolic dysfunction. (ECF Nos. 56-1, 56-2.) He has had two heart attacks in the last several months and suffers from chronic back pain and hypertension. In September 2024, Gary Hatch fell into a creek near his home and hit his head on a rock, causing him mild memory issues but no traumatic brain injuries. (ECF No. 56-2 at 18–21.) In October 2024, Gary Hatch reported to his doctor that he felt lightheaded and had passed out multiple times. (ECF No. 56-2 at 12.) Mr. Hatch reports that, since the accident and the heart attacks, his father has been unable to complete mildly strenuous activities and chores and is struggling to care for himself and his

---

[3] Mr. Hatch's probation officer, Alison Lingel, was unable to verify that Mr. Hatch had completed the Haven and The Valley Camp programs. (See PSR at ¶ 95.)

3

home.  While Gary Hatch has occasional help from the members of his church, his neighbors, his niece, and his grandson, he has no one to provide him around the clock care and supervision, and is left alone at night.  (Def.'s Reply Mem., ECF No. 64 at 2.)  Mr. Hatch has no living siblings, meaning that there is no one else in his immediate family who can provide Gary Hatch daily care.

In December 2024, Dr. Olsen wrote in a letter to the court that Gary Hatch "require[s] the assistance of his son as his caretaker."  (ECF No. 56-1.)  Dr. Olsen's letter did not specify exactly what level of care or supervision Gary Hatch needed.

## LEGAL STANDARDS

Mr. Hatch brings this motion under 18 U.S.C. § 3582(c)(1)(A), a statute modified by the First Step Act of 2018 (FSA).  See Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018).  According to the statute, the court "may reduce the term of imprisonment … after considering the factors set forth in section 3553(a) to the extent they are applicable, if it finds that … extraordinary and compelling reasons warrant such reduction … and that such a reduction is consistent with applicable policy statements by the [United States] Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A).  The factors under 18 U.S.C. § 3553(a) include the nature of the crime, the defendant's characteristics and history, the danger to the public, and the sentencing range.

Before Congress passed the First Step Act, only the BOP could bring a compassionate release motion under § 3582(c)(1) requesting that the court reduce a prisoner's sentence.  Now the court may consider the issue either upon a motion from the BOP or "upon motion of the defendant …."  18 U.S.C. § 3582(c)(1)(A).  The court may only consider a defendant's motion after the defendant has "fully exhausted all administrative rights to appeal a failure of the Bureau

4

of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier ….." Id.

Once a defendant has satisfied the exhaustion requirement, the court applies a three-step test to determine whether to reduce the sentence and release the defendant. United States v. McGee, 992 F.3d 1035, 1042–43 (10th Cir. 2021). First, the court determines "whether extraordinary and compelling reasons warrant a sentence reduction." Id. at 1042 (cleaned up). Second, the court considers "whether such reduction is consistent with applicable policy statements issued by the Sentencing Commission." Id. (cleaned up). Third and finally, the court "consider[s] any applicable § 3553(a) factors and determine[s] whether, in its discretion, the reduction authorized by [steps one and two] is warranted in whole or in part under the particular circumstances of the case." Id. (cleaned up).

Neither § 3582(c)(1)(A) nor the First Step Act defines "extraordinary and compelling reasons," meaning that courts must "determine for themselves" what constitutes such reasons. Id. at 1045. But Congress has also mandated that the Sentencing Commission, "in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples[.]" 28 U.S.C. § 994(t).

The Sentencing Commission's amendments to the Sentencing Guidelines went into effect on November 1, 2023. USSG § 1B1.13; see also 88 Fed. Reg. 7,180 (proposed amendments); 28 U.S.C. § 994(p) (specifying that the Sentencing Commission's proposed amendments go into effect unless Congress modifies or disapproves them). The Sentencing Commission's amendments includes the following bases for a determination that extraordinary and compelling

5

reasons exist: 1) the medical circumstances of the defendant; 2) the defendant's family circumstances; and 3) "Other Reasons." USSG § 1B1.13. Family circumstances may rise to the level of extraordinary and compelling reasons where a defendant's parent or child, for example, is "incapacitated" and "the defendant would be the only available caregiver for the parent." USSG § 1B1.13(b)(3)(C).

## ANALYSIS

### A. Exhaustion of Administrative Remedies

Federal defendants seeking compassionate release from the court under 18 U.S.C. § 3582(c)(1)(A) must first exhaust their administrative remedies by requesting that the BOP file a motion for compassionate release on their behalf. Defendants may file their own motion only if the BOP fails to do so within 30 days or denies their request.

There is an open question about whether Mr. Hatch has exhausted his administrative remedies. Mr. Hatch claims that he submitted an inmate form to the prison warden at FCI Phoenix on October 14, 2024, more than thirty days before he filed this motion. He has attached a copy of his inmate form to this motion. (Inmate Form, ECF No. 55-1.) The BOP claims to have no record of this compassionate release request. (BOP Email dated March 25, 2024, ECF No. 61-1.) Mr. Hatch responds that he has contacted Warden Gunther at FCI Phoenix, asking him to look again for record of his submission. (Def.'s Reply, ECF No. 64.) While this dispute has not been resolved, because the court denies Mr. Hatch's requested relief under 18 U.S.C. § 3553 sentencing considerations, the court need not decide whether Mr. Hatch's requested relief has been administratively exhausted.

B. **Extraordinary and Compelling Circumstances and the Sentencing Commission's Policy Statement**

Mr. Hatch requests compassionate release so that he can care for his father, Gary Hatch. The government concedes that courts regularly find "extraordinary and compelling circumstances" warranting compassionate release where an imprisoned defendant is the "only available caregiver" for an "incapacitated" immediate family member, consistent with the Sentencing Commission guidelines. (See ECF No. 61 at 6–8 (collecting cases).) However, the government argues that Mr. Hatch's circumstances do not qualify as exceptional because 1) Gary Hatch's health problems do not rise to the level of "incapacitation," and 2) Mr. Hatch has not shown that he is the "only available caregiver" for his father. (Id. at 6–8.) The court discusses each factor in turn.

While the court acknowledges that Dr. Olsen's letter provided minimal information regarding the level of care and supervision that Gary Hatch requires, the court disagrees with the government's description of Gary Hatch's medical condition and prognosis. Dr. Olsen recommended that his patient have someone nearby to provide care. And the seriousness of Gary Hatch's medical conditions is evident from his three most recent medical emergencies: two heart attacks and a near-drowning and concussion from a fall. While the government portrays Gary Hatch's escape and recovery from his fall as evidence that Gary Hatch can care for himself, (ECF No. 61 at 6), the court finds troubling the frequency of Gary Hatch's medical emergencies, coupled with his age and long list of serious medical conditions.

Nor, upon examination of the record, is the court fully persuaded by the government's argument that Gary Hatch has another potential caregiver, his grandson, who can provide full-time care as an alternative to Mr. Hatch. In making this argument, the government relies on three cases, each of which is easily distinguished. First, the government cites a case from the

7

United States District Court for the District of Tennessee, United States v. Moore. (Id. at 8 (citing 2022 WL 11865304, at *2 (E.D. Tenn. Oct. 20, 2022)).) In Moore, the court determined that the defendant was not the only available caregiver for his incapacitated parent because the defendant had five siblings in the area who were also available to help. 2022 WL 11865304, at *2. Mr. Hatch, by contrast, has no living siblings.

The government's reliance on United States v. Soto is similarly unavailing. (ECF No. 61 at 8 (citing 2022 WL 1223639, at *4 (D. Kan. Apr. 26, 2022)).). In Soto, the defendant's incapacitated family member had an adult grandchild who lived with her, along with numerous other grandchildren who lived nearby and visited on occasion. 2022 WL 1223639, at *4. The court therefore concluded that the incapacitated family member had sufficient full-time at-home care. Id. Gary Hatch does not live with his grandchildren, whom he sees only on occasion. (ECF No. 64 at ¶ 3; ECF No. 55 at 4.)

Finally, the court finds that the government's reliance on United States v. White is similarly unpersuasive. (See ECF No. 61 at 7 (citing 2023 WL 5510306, at *3 (E.D. Va. Aug. 24, 2023)).) In White, the defendant sought a sentencing reduction so that he could care for his minor daughter, who had recently attempted suicide. 2023 WL 5510306, at *3. But the defendant's daughter had another primary family member as an available caretaker: her mother, with whom she lived. Id. Gary Hatch lives alone.

On the other hand, the court notes that Mr. Hatch has previously represented that he will need to undergo an intensive out-patient substance abuse treatment program after he concludes his sentence. Accordingly, even if Mr. Hatch were released, he would not necessarily be available to provide his father with full-time care while he seeks necessary treatment and rehabilitation.

In any event, the court does not need to determine whether Mr. Hatch has made the requisite showing that he is the only available family member who can provide care for his father because to justify a sentencing reduction, the court must find that a reduced sentence comports with the § 3553(a) sentencing considerations. 18 U.S.C. § 3582(c)(1)(A). And "[d]istrict courts may deny compassionate-release motions when any of the three prerequisites listed in § 3582(c)(1)(A) is lacking and do not need to address the others." United States v. McGee, 992 F.3d at 1043 (adopting United States v. Elias, 984 F.3d 516, 519 (6th Cir. 2021)). As discussed below, the § 3553 factors weigh heavily in favor of denying Mr. Hatch's request. See, e.g., United States v. Lisi, 440 F. Supp. 3d 246, 252 (S.D.N.Y. 2020) (finding "extraordinary and compelling" reasons where the sources indicated that "[the defendant] is the only available caregiver for his mother," but nonetheless denying compassionate release under § 3553 considerations).

C. Section 3553(a) Factors

The § 3553(a) factors a court should consider in imposing sentence include the "nature and circumstances of the offense," the "history and characteristics of the defendant," the purposes of sentencing, such as deterrence and respect for the law, the kinds of sentences available, the sentences and ranges established by the Sentencing Guidelines, "pertinent policy statement[s]" issued by the Sentencing Commission, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," and "the need to provide restitution to any victims." 18 U.S.C. § 3553(a). "[T]he court need not rely on every single [§ 3553(a)] factor—no algorithm exists that instructs the district judge how to combine the factors or what weight to put on each one." United States v.

Gross, 44 F. 4th 1298, 1305 (10th Cir. 2022). Weighing the applicable factors here, the court denies Mr. Hatch's' request to reduce the remainder of his 63-month sentence to time served.

The court first examines the nature and circumstances of Mr. Hatch's offense. While Mr. Hatch portrays his crime as a "less serious version of a serious crime" (ECF No. 55 at 6), the court disagrees. Possession of a stolen firearm, coupled with Mr. Hatch's criminal history, demonstrates that he poses a continuing danger to the community.

Further, the nature of this offense shows that Mr. Hatch learned little from his most recent prior conviction, which involved threatening to shoot a group of people just eleven months before this arrest. (See PSR at ¶ 24.) Indeed, Mr. Hatch was on parole at the time of his arrest, and, according to his parole officer, was not otherwise doing well. (Id. at ¶ 7.) While in custody, Mr. Hatch admitted that he had recently used drugs despite the terms of his supervised release and the many substance abuse programs he has completed. (Id. at ¶ 12.) The nature of this offense demonstrates that Mr. Hatch is not amenable to supervision. He has proven on multiple occasions that he has little capacity or willingness to commit to sobriety or adhere to the law outside the confines of prison. For these reasons, the § 3553 factors weigh in favor of his finishing out his sentence.

Finally, reducing Mr. Hatch's sentence to time served would neither "afford adequate deterrence to criminal conduct" nor "promote respect for the law" because he has not yet served enough of his sentence to reflect the seriousness of his offense. 18 U.S.C. § 3553(a)(2)(A)–(B). Mr. Hatch cites several non-binding cases in support of his argument that his time served thus far is sufficient. (See ECF No. 55 at 6.) He relies first on United States v. Brown, in which the United States District Court for the District of Maryland found that the defendants' 19 years served, 75% of his sentence, was sufficient punishment. See 2020 WL 5747194, at *12 (D. Md.

Sept. 25, 2020). But Mr. Hatch's circumstances are notably distinct. First, Mr. Hatch has served only 58% of his sentence. Second, Mr. Brown was sentenced to 300 months incarceration, which was the highest possible sentence within the mandatory sentencing guidelines for his offense. Id. at 2. Mr. Hatch, by contrast, was sentenced to the low end of the sentencing guidelines for his offense level. (See PSR at ¶ 111 ("Based upon a total offense level of 19 and a criminal history category of VI, the guideline imprisonment range is 63 months to 78 months.").) Fourth, Mr. Brown had a 19-year nearly perfect prison disciplinary record. This is much longer than Mr. Hatch's three years of success. (See ECF No. 57-1.) Finally, the court noted, in granting compassionate release, that Mr. Brown's "incarceration in the midst of a global pandemic has sufficiently increased the severity of the sentence beyond what was originally anticipated such that the purposes of sentencing are fully met even with the proposed reduction." 2020 WL 5747194, at *12 (citations omitted). In other words, as a result of the pandemic, there was a chance that Mr. Brown would die in prison, a punishment far more severe than any court would impose on a defendant guilty of his crime. Mr. Hatch does not face such health concerns were he to finish out his full sentence.

For similar reasons, Mr. Hatch's circumstances are not comparable to those warranting compassionate release in United States v. Musumeci, a non-binding precedent that Mr. Hatch relies on in seeking a reduction of his sentence. (See ECF No. 55 at 7 n.15 (citing 2020 WL 8024350, at *3 (S.D.N.Y. Apr. 28, 2020).) Mr. Musumeci, at 65 years-old, had served 80% of his sentence and suffered from serious health issues, making him, like the defendant in Brown, particularly susceptible to COVID-19 while in prison. See 2020 WL 8024350, at *3. In granting compassionate release, the United States District Court for the Southern District of New York noted that Mr. Musumeci had been convicted of just one offense, enticement, as part of a sting

operation, meaning he was convicted only of an "attempt" to commit a crime. Id. The court also emphasized that the BOP planned to release Mr. Musumeci in June 2020, just two months after the defendant would be compassionately released. None of these circumstances correspond with Mr. Hatch's situation.

Third, Mr. Hatch relies on United States v. Schaffer, in which the United States District Court for the Northern District of California found a defendant's 106 months served, 88% of his sentence, was sufficient punishment given the defendant's medical conditions and his risk of serious illness or death if he were to be infected with COVID-19 while in prison. See 2020 WL 3481562, at *1 (N.D. Cal. June 24, 2020). But as discussed above, Mr. Hatch does not face health concerns of his own. Second, the government in Schaffer, unlike with Mr. Hatch, supported the defendant's early release. And most importantly, the defendant's reentry plan in Schaffer included spending the remainder of his sentence in a residential reentry center. Mr. Hatch, by contrast, is asking for home confinement, which will not provide the same level of rehabilitative services or oversight.

The court finds that the 18 U.S.C. § 3553(a) factors weigh heavily against granting Mr. Hatch compassionate release.

## ORDER

  For the foregoing reasons, the court DENIES the Defendant's Motion for Compassionate Release. (ECF No. 55.)

  DATED this 30th day of April, 2025.

BY THE COURT:

_Tena Campbell_
Tena Campbell
United States District Judge
